## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TSAI-YI YANG, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 2:03-cv-1613 |
| | ) Judge Thomas M. Hardiman |
| FU-CHIANG TSUI, | ) |
| | ) |
| Respondent. | ) |

## OPINION

### I.    Introduction

This case involves the alleged wrongful retention of a child under the Hague Convention on the Civil Aspects of International Child Abduction, 19 I.L.M. 1501 (1980) (Hague Convention or Convention), which was codified by Congress in the International Child Abduction Remedies Act, 42 U.S.C. §11603 *et seq*. Petitioner Tsai-Yi "Elly" Yang (Yang), claims that Respondent Fu-Chiang "Rich" Tsui (Tsui), wrongfully retained their 10 year-old daughter Raeann Tsui (Raeann) in contravention of the Convention. Yang has filed a Petition for Return of Child, which is the subject of this Opinion.

### II.    Procedural History

On October 23, 2003, Yang filed a Petition for Return of Child under the Hague Convention. On November 11, 2003, the Court entered an order abstaining from the exercise of jurisdiction pursuant to the *Younger* abstention doctrine, and closed the case. On August 3, 2005, the Court of Appeals for the Third Circuit reversed and remanded the case for further proceedings.

The Court then reopened the case, directed the parties to submit a position letter detailing the pending issues, and held an evidentiary hearing on June 30, 2006.

## III.   Findings of Fact

Yang and Tsui were raised in the same town in Taiwan, attended elementary school together, and were classmates during their university studies at Tatung Institute of Technology in Taipei, where they became romantically involved. In 1988, Tsui earned a Bachelor of Science in electrical engineering and Yang earned a Bachelor of Arts in business management. Yang then went to work while Tsui served a mandatory term of service in the Taiwanese military.

Upon completion of his military service, Tsui moved to the United States to continue his studies at the University of Pittsburgh, where he earned a Ph.D. in electrical engineering in 1997. In approximately 1992, while Yang was still living in Taiwan, Tsui called her and proposed marriage, but Yang rejected the proposal. In 1994, Yang also moved to the United States to pursue a master's degree in information science. She attended Penn State University for a short time and then transferred to the University of Pittsburgh. Upon her arrival in Pittsburgh, Tsui met Yang at the airport and arranged for her to rent an apartment in Squirrel Hill, in the building next to Tsui's residence, where he lived with his mother. Tsui informed Yang that he was engaged to another woman, Ms. Fen-Fang Chen (Chen), with whom he had fathered a child a month before, and Tsui married Chen about a month after Yang arrived in the United States in 1994. In spite of Tsui's marriage to Chen, Tsui and Yang again became involved romantically in 1995 and that same year, Yang became pregnant by Tsui. In December of 1995, Yang graduated from the University of Pittsburgh with a Master of Science in information science and at the invitation of

2

Tsui and his mother, Yang moved in with their family as of January 1996. Tsui also told Yang that she would be his "number two wife."[1]

On June 11, 1996, Yang gave birth to Raeann Tsui in Pittsburgh. Yang and Raeann continued to live with Tsui and his family until December of 1996, when they visited Taiwan. They remained in Taiwan for five or six months and Tsui accompanied them for the first two weeks of this visit. In May 1997, Yang and Raeann returned to Pittsburgh and again lived with Tsui and his mother for some three months. Tsui's wife, Chen, had previously moved back to Taiwan after a dispute with Tsui.

On August 15, 1997, Yang and Raeann returned to Taiwan both for the funeral of Yang's niece and because of the imminent expiration of Yang's visa. Although initially intending to stay in Taiwan for only a short time, Yang and Raeann remained there for four years. Meanwhile, Chen returned to Pittsburgh and resumed living with Tsui. Yang found work in Taiwan as a computer systems analyst, which utilized her graduate degree in information science. Although Yang attempted to continue the relationship with Tsui by phone, he did not wish to do so, although they spoke at least once a month. Because of Raeann's age, however, she and Tsui did not establish a relationship by phone. As a result of their conversations, Tsui was informed of where Yang and Raeann were living. Tsui traveled to Taiwan at least twice during this period to visit relatives, who lived in a town approximately 40 kilometers from where Yang and Raeann were living. Despite knowing that Yang and Raeann were living nearby, Tsui did not visit them

---

[1] According to Yang, around January of 1996, approximately five months prior to the birth of their daughter, she began living with Tsui and his family. Tsui contends that Yang did not move in with his family until May of 1996. This discrepancy is immaterial to the decision in the case.

during his two trips to Taiwan. Throughout this period, Yang asserts that Tsui made no financial contribution to support Raeann, but Tsui claims that he gave Yang about $6,000 while she and Raeann were in Taiwan.

In 2000, Yang sought to immigrate with Raeann from Taiwan to Canada because of the stigma that attached to an unwed mother in Taiwan, her inability to return to the United States, and her belief that the clean air in Canada would be beneficial to Raeann, who had developed a skin condition. Tsui disputes this, believing that Yang wished to be closer to him. As evidence of this he argues that if Yang really wanted to find a home with cleaner air for Raeann, they could have moved to China.

On July 13, 2000, Yang traveled to Canada for a few days to activate her landed immigrant visa and then returned to Taiwan to prepare to move to Canada. In April 2001, Yang and Raeann immigrated to Canada, moving into an apartment in Surrey, British Columbia, a city of about 400,000 people. After initially living on her savings, Yang sought a job in which she could utilize her graduate degree, but she was unsuccessful. Accordingly, Yang began working part-time as a cashier and counter crew member at McDonald's, where she earned approximately $17,000 per year, before taxes, while she cared for Raeann. Yang has since received a promotion and is still employed at McDonald's today.

In addition to her own efforts, Yang also relied on friends and neighbors to help care for Raeann. In September 2001, Raeann began kindergarten at Holly Elementary School, where Yang met parents with whom she could share child care duties. In April 2001, at Yang's prodding, Tsui began to provide financial support for Raeann, contributing about $6,000 as well as a computer and some other gifts. There continued to be little contact between Tsui and Raeann, but he and

4

Yang were in contact by phone or email at least once a month. Tsui also gave Yang a digital camera so she could send pictures of Raeann to him.

In August 2001, Yang began experiencing blurred vision and was prescribed glasses. Soon thereafter she developed muscle weakness and difficulty swallowing, speaking, and breathing. After researching her symptoms independently on the internet, Yang again sought medical attention. In September 2002, Yang was diagnosed with malignant thymoma. A tumor had developed in Yang's chest and was causing myasthenia gravis, a condition which resulted in muscle weakness in her chest and neck. The tumor also interfered with Yang's ability to speak properly and swallow. Yang was told by her doctor that she must undergo major surgery to remove the tumor and she would be hospitalized for seven to ten days and then be unable to work for two to three months while she recovered.

In light of her medical problems, Yang contacted Tsui to suggest that he take care of Raeann during her surgery and recovery. On October 9, 2002, Yang sent Tsui an email that stated: "[i]t would be better if you can pick up and take care of Raeann. I can't work for at least two and a half months . . . if anything happens to me, at least you can still raise Raeann." By this time, Tsui and his wife Chen had two sons, Raeann's half-brothers. Tsui was resistant to Yang's proposal at first and suggested that Raeann remain in Canada with a friend. Yang had considered this, but believed her anticipated incapacitation would be too burdensome on a friend. Tsui eventually agreed to come to Surrey and take Raeann back to Pittsburgh with him until Yang recovered. Tsui suggested that if he was going to take Raeann from mid-October, Raeann should stay with him until the end of that school term. Yang agreed, although she was unaware that the school term in Tsui's school district runs until late January.

5

On October 23, 2002, Yang entered the hospital and sent the following email to Tsui:

> I packed Raeann's stuff. There will be three packs. I'll put it in the living room. Please check first before you leave. Probably some of the stuff is unnecessary. My friend gave me some VCD's. I also put them in. If you don't want them, just take them out. First, the green bag is winter clothes and shoes. Second, the smallest bag is play stuff. Three, the bigger bag is summer clothes. P.S. Raeann doesn't like long sleeves.

Yang underwent surgery on October 24, 2002 and a friend of Yang took care of Raeann until Tsui arrived in Canada on October 26, 2002. Yang's friend and Raeann met Tsui at the airport in Vancouver and brought them to the hospital where they visited with Yang. Yang also provided documents needed to register Raeann in her new school and a letter permitting Tsui to travel to the United States with Raeann. Tsui claims that there was no limit placed on the amount of time Raeann would spend with him, but agrees that the arrangement was that Raeann would stay with him until Yang fully recovered unless Yang died, in which case Raeann would live with him permanently. Tsui and Raeann returned to Pittsburgh the next day, October 27, 2002 and Tsui left $1,000 cash with Yang. This was the first time Raeann had seen her father since August of 1997.

Yang was discharged from the hospital on November 2, 2002. Although she initially spoke to Raeann daily, this changed after Tsui's wife, Chen, complained that Yang's daily calls were burdensome to their family. Consequently, Tsui allowed Yang to speak to Raeann only every other night. Yang claims that Raeann asked to return to Canada at this time and Yang was worried that Raeann was homesick and unhappy. Yang told Tsui to return Raeann to Canada, and threatened legal action if he refused. In fact, Yang offered to travel to Pittsburgh to retrieve her daughter. Tsui insists that Yang did not demand Raeann's return until April 4, 2003 in a letter

6

from her Canadian attorney, Andrew Sandilands (Sandilands). The Court finds Yang credible regarding this factual dispute.

Although Yang intended to travel to Pittsburgh to retrieve Raeann, on November 20, 2002, she returned to the emergency room at Vancouver Hospital because she had difficulty breathing. She was told that her myasthenia gravis was not resolved and, on November 22, was moved into the Intensive Care Unit, where she remained for seven days. Because Yang was unable to speak at this time, she did not talk to Raeann or Tsui. Others did contact Tsui on Yang's behalf, however. Linda Lougheed, a social worker at the hospital, spoke to Tsui on November 23, 2002 at which time Tsui indicated that he was willing to bring Raeann to Vancouver if Yang's condition worsened, or otherwise at the end of the school term. Additionally, Yang's brother and her friend, Sherry Hsu (Hsu), also spoke to Tsui by phone and he assured both that he would bring Raeann back to Vancouver in December. Hsu's request for Raeann to visit was at least in part because of the possibility that Yang might pass away as a result of her illness. Tsui and Raeann never did visit Yang in the hospital, however.

After a week in the Intensive Care Unit, Yang was transferred to the "step-down" ward, where she stayed for two days before being transferred to the General Neurology ward, where she remained until December 28, 2002. Throughout this hospital stay, Yang was barely able to talk and had great difficulty carrying on a conversation. On or about December 2, 2002, Yang called Tsui, concerned about his intentions regarding Raeann. Tsui told her he would return Raeann at the end of the school term, which Yang then knew was the end of January. Yang continued to call every other day and became concerned when she was unable to reach Raeann or Tsui for approximately a week. Yang learned later that, unbeknownst to her, Tsui's family had taken

7

Raeann on vacation. Around the second week of December, Sherry Hsu told Yang that she had spoken on the telephone to Tsui and that he had asked for her address so that he could send some photographs of Raeann. Tsui sent the photographs on December 18, 2002.

The day before Tsui sent photographs and while Yang remained in the hospital, on December 17, 2002, a cover letter and "Complaint for Custody, Order for Generations Education/Mediation Seminar" arrived at Hsu's house. Tsui filed the Complaint in Pennsylvania state court on December 11, 2002 and received a Court Order granting him custody on February 6, 2003. Included with the Complaint was information regarding the "Generations" seminar, which is an adjunct service provided by the Court of Common Pleas of Allegheny County to parents involved in custody mediations. This information instructed Yang that she was required to attend an educational seminar in Pittsburgh on January 4, 2003 at 9:00 a.m., prior to a mediation session scheduled for February 11, 2003. Yang contacted the "Generations" office in Pittsburgh and advised that she was unable to attend for health reasons and based on her conversation Yang believed that the "Generations" seminar was adjourned. After she was released from the hospital on December 28, 2003, Yang then underwent twenty sessions of radiation therapy. Neither Yang nor her attorneys ever contacted the Pennsylvania courts directly or appeared at the proceeding.

Yang then hired Canadian attorney Sandilands who, by letter dated January 6, 2003, demanded that Raeann be returned to Yang immediately. Sandilands initiated custody proceedings in Canada, where from the end of January to March 11, 2003 there were five custody proceedings. Yang attended all but the first session. Tsui was represented by Canadian counsel for all of the hearings except for the first, but did not appear himself. Neither Yang nor Tsui testified at the Canadian proceeding, but Tsui did file an affidavit. After the Supreme Court of

8

British Columbia granted interim custody to Yang on March 25, 2003, Sandilands then sent another letter on April 4, 2003 requesting that Tsui return Raeann pursuant to the Canadian custody order.

In May 2003, Sandilands filed an application with the Canadian Attorney General's office to have Raeann returned under the Hague Convention. Subsequently, there was a Petition for Return of Child filed in this Court on October 23, 2003. Yang did not see Raeann until November of 2005, when she was in Philadelphia to attend oral argument before the Third Circuit Court of Appeals. While in the United States for these proceedings, Yang attempted to see Raeann at school and at Tsui's home. Additionally, she went to the homes of two of Tsui's neighbors in an attempt both to see Raeann and to leave gifts for her. Tsui stated at trial that Yang left threatening messages on his family's answering machine and followed his wife's car. As a result, Tsui obtained a Protection From Abuse Order from the Court of Common Pleas of Allegheny County on October 8, 2004, prohibiting Yang from seeing or speaking to Raeann without Tsui's permission. There was a proposed written schedule of visitation in conjunction with the Pennsylvania proceeding, but Yang did not agree to it. After returning to Canada, Yang was served with the Protection From Abuse Order, which resulted in even less contact with Raeann, although Yang eventually was permitted to talk to Raeann every Monday and Friday from 8:00 to 8:30 p.m.

In November 2005, Yang came to the Pittsburgh area and attempted to schedule visitation with Raeann. The parties were unable to amicably craft a visitation schedule, and Yang filed a motion, enlisting the help of this Court in structuring the visit. Visitation was conducted in chambers for several hours on two weekdays, and then at another location over the weekend.

Yang's myasthenia gravis has now been in remission for three years. During the hearing,

Yang exhibited no signs of physical illness or weakness and her testimony was lucid, articulate,

and credible.

## IV.    Analysis

### A.    Introduction

The Hague Convention on the Civil Aspects of International Child Abduction was passed

on October 25, 1980. 19 I.L.M. 1501. The United States Congress ratified the Hague Convention

in the International Child Abduction Remedies Act. 42 U.S.C. §11601 *et seq*. The Court of

Appeals for the Third Circuit recently stressed the broad goals of the Convention:

> The two main purposes of the Hague Convention are to ensure the prompt
> return of children to the state of their habitual residence when they have
> been wrongfully removed and to ensure that rights of custody and of
> access under the law of one Contracting State are effectively respected in
> the other Contracting States. The Convention's procedures are not
> designed to settle international custody disputes, but rather to restore the
> status quo prior to any wrongful removal or retention, and to deter parents
> from engaging in international forum shopping in custody cases.

*Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006) (internal citation omitted). This

action presents a prototypical case of international forum shopping to which the Court of Appeals

adverted in *Karkkainen*.

### B.    Petitioner's Burden

Under the Hague Convention, "an applicant seeking return of a child must demonstrate by

a preponderance of the evidence that he or she had and was exercising custody rights over the

child under the country of origin's laws and that the country of origin was the child's habitual

residence." *In re Application of Adan*, 437 F.3d 381, 390 (3d Cir. 2006) (internal citations

omitted); 42 U.S.C. §11603(e)(1)(A). Thus, "wrongful removal or retention claims under article 3

10

of the Convention typically raise four issues for analysis: when the removal or retention at issue occurred, the country in which the child was habitually resident prior to the removal or retention, whether the removal or retention breached the custody rights of the petitioner, and whether the petitioner was exercising those custody rights at the time of the removal or retention." *Baxter v. Baxter*, 423 F.3d 363, 368 (3d Cir. 2005) (internal citations omitted).

### 1. Date of Retention

The Court must first determine when the allegedly wrongful retention occurred in this case, because the necessary habitual residence and custody determinations relate to the time of retention. Hague Convention, art. 3, 19 I.L.M. 1501. Yang testified that sometime between her initial discharge from the hospital following surgery on November 2, 2002 and her readmittance for additional treatment on November 20, 2002, she told Tsui that she wanted Raeann to return to Canada. The Court finds that Yang was a truthful, credible witness who testified with a clear recollection of events.

Tsui, on the other hand, testified on direct examination that no demand for Raeann's return was made until April 4, 2003, when he received a letter from Yang's attorney. Tsui also stated that he did not remember any conversation prior to April 4, 2003 in which Yang demanded Raeann's return or insisted that her custody rights were being violated. On cross examination, however, Tsui directly contradicted this testimony. He admitted that he spoke with Yang between November 2, 2002 and November 20, 2002, that she insisted Raeann wanted to come home, and that she threatened legal action. Furthermore, Tsui admits in Proposed Finding of Fact 20 that the "[m]other demanded that Father return the Child to Canada in mid-November 2002, immediately before being readmitted to the hospital." Based on the evidence, the Court finds as a matter of

11

fact that Yang demanded that Tsui return Raeann sometime before her readmittance to the

hospital on November 20, 2002. Therefore, November 20, 2002 is the date of retention in this

case.

## 2. Habitual Residence

Having determined the date of retention, the Court must now address the issue of habitual

residence. As the Third Circuit recently held:

> a petitioner cannot claim that the removal or retention of a child is
> 'wrongful' under the Hague Convention unless the child to whom the
> petition relates is 'habitually resident' in a State signatory to the
> Convention and has been removed to or retained in a different State.
> Determination of a child's habitual residence immediately before the
> alleged wrongful removal or retention is therefore a threshold question in
> deciding a case under the Hague Convention.

*Karkkainen*, 445 F.3d at 287 (internal citation omitted).

The determination of habitual residence "is not formulaic; rather, it is a fact-intensive

determination that necessarily varies with the circumstances of each case." *Whiting v. Krassner*,

391 F.3d 540, 546 (3d Cir. 2004). The Third Circuit Court has "defined a child's habitual

residence as the place where he or she has been physically present for an amount of time sufficient

for acclimatization and which has a 'degree of settled purpose' from the child's perspective. The

inquiry must focus on the child and consists of an analysis of the child's circumstances in that

place and the parents' present, shared intentions regarding their child's presence there." *Baxter*,

423 F.3d at 368 (internal citations omitted).

In *Karkkainen*, the Court of Appeals explained that "if a child becomes rooted in one

country, we will not return her to another one where doing so would take her out of the family and

social environment in which her life has developed. Simply put, this inquiry considers whether a

12

child has made a country her home before the date of her removal or retention." *Karkkainen*, 445

F.3d at 292 (internal citation and punctuation omitted). However, "when a child is too young to

have an intent regarding her habitual residence, the touchstone inquiry is shared parental intent."

*In re Application of Adan*, 437 F.3d at 392 (internal citations omitted). On November 20, 2002 -

the date of retention - Raeann was only five years old and the Court finds as a matter of law that a

five year-old child is too young to have an intent regarding her habitual residence. Thus, the

"touchstone inquiry" in this case is whether Yang and Tsui shared an intent immediately prior to

November 20, 2002 to make Pittsburgh Raeann's home. The facts in this case clearly demonstrate

that they did not.

Both parties fundamentally agree that at the time Raeann left Canada to come to the

United States they intended for her to live with her father until her mother recovered from surgery.

Yang testified that her expected recovery time was two to three months. This is corroborated by

the email that Yang sent to Tsui on October 9, 2002, in which she details the reason why she

needed Tsui to take care of Raeann temporarily. She told Tsui that "I can't work at least two and

a half months," and laments that "two month [sic] is not a short period of time. What kinds of

friends can help so much?" While this was Yang's expectation, the parties also discussed what to

do in the event that Yang would die from the surgery. They agreed that, in that case, Raeann

should continue to live with Tsui.

On direct examination, Tsui denied that there was any discussion of a two or three month

period and insisted that their understanding all along was that Raeann would live in Pittsburgh

until Yang recovered, without any estimate as to the duration of her stay. But Tsui himself

submitted a sworn affidavit on February 3, 2003 relating to the Canadian custody proceeding, in

13

which he stated that "Elly expected full recovery within a couple of months." When confronted with this prior statement, Tsui attempted to harmonize it with his hearing testimony, insisting that he had been asked about two or three months, as opposed to a couple of months. He then elaborated that "so could be like couple months means like four, five months, something like that." This explanation strains credulity, particularly in light of that fact that Tsui earned a Ph.D. in the United States. In fact, when asked by the Court, Tsui admitted that Yang had told him she expected to recover in a couple of months. Tr. at 225-26.

Tsui argues that Yang's inclusion of a large suitcase of summer clothes in Raeann's luggage suggests that the parties expected her stay to be much longer than a few months. Yang's email describing what she packed, however, indicates that Raeann prefers to wear short sleeves. In addition, it appears that Yang was planning for the contingency that she might not live through the surgery by sending Raeann with the clothes she would need if her stay were to be longer than planned. This contingency does not refute the conclusion that her parents' intention was for Raeann to stay for only a few months.

The evidence demonstrates beyond doubt that the original intent of the parties was for Raeann to stay approximately two to three months and that soon after Raeann came to the United States, Tsui decided to assert unilateral custody over Raeann. This decision is reflected in Tsui's own testimony, as well as his behavior in the first few months of Raeann's time in the United States. Tsui brought Raeann to Pittsburgh on October 27, 2002. Less than a week later, on November 2, Yang was discharged from the hospital and was speaking to Raeann daily. This soon changed, however, when Tsui decided that daily conversations were too burdensome, and he allowed Yang to speak to her daughter only every other evening. Then, on December 11, 2002,

14

Tsui filed for custody of Raeann in Pittsburgh. At trial he claimed he was planning to bring

Raeann to Canada to visit Yang in the hospital, and obtained a custody order to protect Raeann, to

"make sure Raeann can come back to the United States." Tr. at 204. The Court finds this

testimony particularly troubling and probative, because Raeann is an American citizen who had no

trouble traveling to the United States a mere six weeks before Tsui obtained the custody order.

Rather than a concern for her travel status on a trip they never made, Tsui's testimony

clearly reflects the real reason behind his race to the courthouse. When asked by the Court why he

has not returned Raeann following Yang's recovery, Tsui stated:

> I have a custody right here. I believe Pittsburgh is the right place for
> Raeann and would be in the best interest for Raeann to stay with me.
> I'm the father of Raeann. In Chinese culture, the father is the center of
> the family, and kids follow father, and father basically, if the father is
> prosperous, the kids can get the benefit from father or from parents . . . .
> Here I can provide abundant [sic] of resources for Raeann and all my
> kids to learn, to learn better, and to get a better life, and hopefully, they
> can succeed in the future, and that's my part in life. I want to see my
> kids succeed in the future so we can keep our family tradition here
> because my dad, my mom, they are all teachers, and I follow the
> tradition here. I'm a school teacher as well. I would like to devote all
> my energies to my family, to my children so they can follow our family
> steps to have -- to get a better education.

Tr. at 230-31. This admirable desire to care for the best interests of his daughter - which was

nowhere apparent during the first five years of Raeann's life - surfaced almost immediately after

she came to live in the United States. Most importantly, this sudden dedication comes from

someone who was married at the time he impregnated another woman, whom he then invited to

be his "number two wife." Although Raeann appears to be well adjusted and receiving an

outstanding education, these facts do not obviate Tsui's actions.

15

Thus, it is clear from the testimony of both parties that they intended for Raeann to stay with her father until Yang recovered, a period which they anticipated would last two to three months. At the time of retention, Raeann was less than a month into what was expected to be a two to three month stay. In the words of the Third Circuit in *Karkkainen*, she could not have become "firmly rooted in her new surroundings" nor was Pittsburgh at that time the "family and social environment in which her life has developed." 445 F.3d at 292. Even more important, the shared intent of the parents was not for Raeann to make Pittsburgh her home, unless Yang passed away. Accordingly, the Court finds that Canada was Raeann's habitual residence on November 20, 2002.

Tsui argues that Raeann's habitual residence is and was the United States rather than Canada. Yet respondent fails to cite a single Third Circuit case in support of this conclusion, pointing to cases from other circuits that he claims should determine Raeann's habitual residence. He first argues that the shared intent of the parents in this case was for Raeann to come to the United States for an indefinite period, which resulted in a change in her habitual residence. Tsui points out the large amount of clothes that Raeann brough to the United States, as well as the parents' understanding that, should Yang not survive the surgery, Raeann would stay and live with her father. Tsui then cites *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001), stating that "sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely. When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence." *Id.* at 1077. In the very next sentence, however, the *Mozes* court stated:

16

 "[o]ther times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred." *Id.* The record is clear in this case that the parties' agreement was that Raeann would live with Tsui until Yang recovered, a period that was predicted to last approximately two to three months. The intent of the parents in this case falls into the second type of agreement discussed in *Mozes*, which demonstrates that Canada remained Raeann's habitual residence. Furthermore, and most significantly, Yang's conduct was diametrically opposed to an intent for Raeann to abandon Canada as her habitual residence. Rather, Yang's conduct consistently demonstrated a desire to have Raeann with her as long as she was physically able to care for her.

Tsui goes on to argue that the Court should consider Raeann's current level of acclimatization and degree of settled purpose in determining her habitual residence. This argument directly contradicts not only the established Third Circuit precedent but also the *Mozes* case upon which Tsui relies so heavily. The Ninth Circuit in *Mozes*, like the Third Circuit in *Karkkainen, Baxter* and *In re Adan*, directs that habitual residence be determined "*immediately prior* to the removal or retention." *Mozes*, at 1070 (emphasis added). As of November 20, 2002, Raeann had been in the United States for less than a month.

While the Court has found that retention occurred on November 20, 2002, the habitual residence determination would be the same even if retention was deemed to occur at a later date. The agreement of the parties was clearly that Raeann would stay with Tsui until Yang recovered. Although she made a demand for Raeann to be returned at the latest by the end of November, Yang then suffered complications resulting from her surgery and her recovery took longer than

17

expected. It is undisputed, however, that Yang had recovered by April 2003, and had been consistently attempting to secure Raeann's return. As of April 2003, Raeann still was not old enough to warrant an analysis of her degree of settled purpose, and there can be no argument that the shared intent of the parents was for her to remain in the United States longer than it took Yang to recover. Thus, even if April 2003 were the date of retention in this case, Raeann was still living in Pittsburgh on a temporary basis until her mother recovered and had not become sufficiently settled to effect a change in her habitual residence.

### 3.   Custody Rights of the Petitioner

Having determined that Canada was Raeann's habitual residence, the Court must now examine whether Yang had custody rights at the time of retention. "The Convention defines custody rights as 'rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.' Hague Convention, art. 5(a), 19 I.L.M. at 1501." *In re Application of Adan*, 437 F.3d at 391. "In determining custody, the Convention calls into play a State's choice of law rules as well as its internal custody rights laws. This requires a careful examination of the country of origin's custody laws to determine whether the party seeking the child's return had custody rights in that country and was exercising them, within the meaning of that country's law, at the time the child was removed." *Id.* (internal citations omitted).

At the hearing, both parties called expert witnesses to educate the Court on the custody law of British Columbia. These experts agreed that the operative statute is Canada's Family Relations Act, which states in pertinent part:

> 34 (1) Subject to subsection (2), the persons who may exercise custody over a
>        child are as follows:
>        (a) if the father and mother live together, the father and mother jointly;

18

> (b) if the father and mother live separate and apart, the parent with whom
> the child usually resides;
>
> (c) if custody rights exist under a court order, the person who has those
> rights;
>
> (d) if custody rights exist under a written agreement, the person to whom
> those rights are given.
>
>     (2) If persons have conflicting claims to custody under subsection (1), the
> following persons may exercise custody to the exclusion of the other persons
> unless a court otherwise orders:
>
> > (a) the person who has custody rights under a court order;
> >
> > (b) if paragraph (a) does not apply, the person granted custody by an
> > agreement;
> >
> > (c) if paragraphs (a) and (b) do not apply, the person claiming custody with
> > whom the child usually resides;
> >
> > (d) if paragraph (c) applies and 2 persons are equally entitled under it, the
> > person who usually has day to day personal care of the child.

R.S.B.C. 1996, c. 128, s. 34. In this case, on November 20, 2002, the father and mother lived

separate and apart, and there was neither a court order nor a written agreement. Thus, section

34(1)(b) applies and custody belonged to the parent with whom the child usually resided.

    Attorney Alison Ouelett, the expert called by Tsui, was asked a hypothetical by Yang's

counsel that mirrors the facts of this case. Specifically, she was asked what the custody status

would be if the mother told the father "you can have the child while I recover from the surgery

that I need to get, and it is going to take several months, a couple of months." Ouelett's response

is consistent with both the Court's view and Yang's expert's opinion. Ouelett responded:

> I think in that situation, a judge would determine based upon the facts,
> and it would be a finding of fact, whether when the mother said in
> several months I would like to have the child returned, if it was a
> specific date or if it was some indefinite date, and whether when she
> did that, she intended to hand over the custody rights. I think that the
> issues that would be looked at in determining that fact would be . . .
> whether on the facts of the case before that judge it was considered to
> be an extended visit or to be a transfer of the custody.

19

Tr. at 152-53. Ouelett then agreed with the statement that "there really is no definition of limited period of time whether it be a day, a week, a month, it could be a couple months." Tr. at 167. In light of the testimony in this case, as well as the factual circumstances surrounding Raeann's travel to the United States, the Court finds that she usually resided with her mother and the temporary arrangement with Tsui was not meant to change that fact. Raeann's trip to the United States was intended by her parents to be an extended visit coextensive with Yang's convalescence and not a transfer of custody for an indefinite period of time.

Yang's testimony established that she and Raeann lived with Tsui for the first six months of Raeann's life, from June 1996 until December 1996. They then traveled to Taiwan until May of 1997, returning to Pittsburgh until August or September of the same year. Tsui testified that he accompanied Yang and Raeann for the first two weeks of their trip to Taiwan in December 1996. In late 1997, Yang and Raeann moved to Taiwan and lived there until April 2001, when they moved to Canada, where they remained until Yang took ill in October 2002. Thus, as of November 20, 2002, Raeann had not lived with her father since she was little more than a year old, and had spent no more than 10 months of her five and a half years in Pittsburgh. There is no evidence that she visited Pittsburgh between late 1997 and October of 2002. Not surprisingly, Raeann traveled to the United States with three suitcases full of belongings that her mother had packed for her, because there is no evidence that she had any clothes or personal belongings at her father's house.

At the time of retention, Raeann had been living with her father for less than a month. Other than the time immediately following her birth in 1996, she had lived exclusively with her mother in Taiwan and, subsequently, in Canada. It is clear to the Court that Raeann usually

20

resided with her mother, not her father. Therefore, Yang had custody of Raeann under Canadian law.

### 4. Exercising Custody Rights

Having determined that Yang had custody rights immediately before the retention, the Court next must examine whether she was exercising those rights. "Once it is determined that a party had valid custody rights under the country of origin's laws, very little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised." *In re Application of Adan*, 437 F.3d at 391. "If a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Baxter*, 423 F.3d at 370 *citing Friedrich v. Friedrich,* 78 F.3d 1060, 1065-66 (6th Cir.1996). Yang did nothing in this case that constitutes clear and unequivocal abandonment of Raeann, and thus she was exercising her custody rights at the time of retention.

Tsui argues that because Yang was very ill during November of 2002, and her medical complications persisted until she was fully recovered in April 2003, she could not have cared for Raeann and thus was not exercising whatever custody rights she had at the time of retention. Tsui does not cite any case law or other authority in support of his argument that a temporary inability to provide daily care constitutes a failure to exercise custody rights. Moreover, this argument contravenes the Third Circuit's guidance in *Baxter* that nothing short of clear and unequivocal abandonment constitutes a failure to exercise custody.

21

In sum, the Court finds that Yang has satisfied her burden under the Hague Convention,

having proved by a preponderance of the evidence that when Raeann was retained on November

20, 2002, Yang had, and was exercising, custody of Raeann and Canada was Raeann's country of

habitual residence.

## B. Respondent's Burden

Article 12 of the Convention mandates the return of children who have been wrongfully

removed or retained: "where a child has been wrongfully removed or retained in terms of Article

3 and, at the date of the commencement of the proceedings before the judicial or administrative

authority of the Contracting State where the child is, a period of less than one year has elapsed

from the date of the wrongful removal or retention, the authority concerned shall order the return

of the child forthwith." Convention, art. 12, 19 I.L.M. at 1502-03. In this case, Yang filed her

petition on October 23, 2003, within one year of the November 20, 2002 retention date. Thus, the

Court must order that Raeann return to her mother unless one of the exceptions to mandatory

return applies.[2]

The Third Circuit has held that, upon the showing of wrongful removal or retention, "the

burden shifts to the party that wrongfully removed the child to show by clear and convincing

evidence that the Article 13(b) exception applies, or by a preponderance of the evidence that the

Article 13(a) exception applies. 42 U.S.C. § 11603(e)(2)(B)." *In re Application of Adan*, 437 F.3d

at 390 (internal citations omitted). Article 13 of the Convention states:

---

[2]  The Third Circuit stated in this case that one year had not elapsed, and thus "the 'well-settled'
determination would not be relevant in this case." *Yang v. Tsui*, 416 F.3d 199, 203 n.4 (3d Cir. 2005).

22

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that -

a. the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal of retention; or

b. there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

Convention, art. 13, 19 I.L.M. at 1502-03. The only exceptions relevant to this case are the

Article 13(a) exception dealing with consent and the unnumbered paragraph dealing with the

objection of the child.[3]

### 1.    Article 13(a) Exception - Consented to or Acquiesced in Retention or Removal

The affirmative defenses of consent and acquiescence are separate and distinct, although

both are narrow. "Consent need not be expressed with the same degree of formality as

acquiescence in order to prove the defense under article 13(a). Often, the petitioner grants some

measure of consent, such as permission to travel, in an informal manner before the parties become

---

[3] Although Tsui pleaded the "grave risk of harm" defense, he abandoned it at the hearing. Tr. at 50. Furthermore, the Court has already determined there is no evidence of clear and unequivocal abandonment necessary to find that Yang was not exercising her rights under the Hague Convention.

involved in a custody dispute. The consent and acquiescence inquiries are similar, however, in their focus on the petitioner's subjective intent." *Baxter*, 423 F.3d at 371 (internal citations omitted).

The Court will first determine whether Yang consented to Tsui's retention of Raeann. "In examining the consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country. The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account." *Id.* (internal citations omitted). Importantly for this case, "the fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the convention." *Id.* (internal citations omitted).

The Court finds in this case as a matter of fact that the initial permission given by Yang for Raeann to travel to the United States was for the limited purpose of staying with her father until Yang recovered from her surgery. All the evidence in this case, from Yang's testimony to the documents she filed with the Canadian and Central Authorities, indicates a constant and determined effort by Yang since late 2002 to secure Raeann's return. The record is devoid of any evidence to suggest that Yang consented to Tsui's retention of Raeann. Accordingly, Tsui has not established consent by a preponderance of the evidence.

Regarding the defense of acquiescence, the Third Circuit stated in *Baxter* that it requires "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Baxter*, 423 F.3d at 371 (internal citations omitted). Having failed to

24

carry the lighter burden of consent, Tsui cannot demonstrate acquiescence in this case. Indeed,

the testimony in the Canadian custody hearing and the other written materials in this case are

directly contrary to acquiescence insofar as Yang actively sought to have Raeann return to British

Columbia. Thus, the Court finds that Tsui has not proven either of the Article 13(a) defenses by a

preponderance of the evidence.

## 2. Wishes of the Child Exception

The Court notes at the outset that the unnumbered paragraph of Article 13 delineating the

"wishes of the child exception" leaves its application wholly to the discretion of the district court.

It states that the Court *may* refuse to order the return of the child, in contrast to the mandatory

directive *shall* included in Article 12. Moreover, like the grave risk exception, the 'age and

maturity' exception is to be applied narrowly." *England v. England*, 234 F.3d 268, 272 (5th Cir.

2000) (internal citations omitted). The Explanatory Report to the Convention sheds light on the

rationale behind this exception and the manner in which its framers intended it to be applied:

> [S]uch a provision is absolutely necessary given the fact that the
> Convention applies, *ratione personae*, to all children under the age of
> sixteen; the fact must be acknowledged that it would be very difficult to
> accept that a child of, for example, fifteen years of age, should be
> returned against its will. Moreover, as regards this particular point, all
> efforts to agree on a minimum age at which the views of the child could
> be taken into account failed, since all the ages suggested seemed
> artificial, even arbitrary, it seemed best to leave the application of this
> clause to the discretion of the competent authorities.

25

Explanatory Report by Elisa Perez-Vera, in 3 Actes et documents de la Quatorzieme session 426,

¶30 (1982) (Explanatory Report).[4] The report makes clear that the intent of this exception was not

to allow its application to defeat the larger goals of the Convention itself:

> To conclude our consideration of the problems with which this paragraph
> deals, it would seem necessary to underline the fact that the three types of
> exception to the rule concerning the return of the child must be applied
> only so far as they go and no further. This implies above all that they are to
> be interpreted in a restrictive fashion if the Convention is not to become a
> dead letter . . . [A] systematic invocation of the said exceptions,
> substituting the forum chosen by the abductor for that of the child's
> residence, would lead to the collapse of the whole structure of the
> Convention by depriving it of the spirit of mutual confidence which is its
> inspiration.

Explanatory Report at ¶34. Even if the Court determined that Raeann had reached an age and

degree of maturity such that her opinion should be given weight, refusing to return her to Canada

under the facts of this case would be inappropriate and achieve exactly the result that the Report

counsels against.

Any objection that Raeann may have to returning to Canada is a direct result of Tsui's

wrongful retention. The record is devoid of any evidence indicating that Raeann wished to move

to Pittsburgh to live with her father prior to Yang's illness. Nor has Tsui demonstrated such a

desire at the time the retention occurred. On the contrary, it seems clear that any attachment that

Raeann has made to her living conditions and family in Pittsburgh happened as a result of the

passage of time during the instant litigation. To refuse to return children based upon their

---

[4] The Explanatory Report falls within the ambit of materials that the Supreme Court has
determined should be used to interpret treaties. *See Zicherman v. Korean Air Lines Co., Ltd.,* 516 U.S.
217, 226 (1996) ("Because a treaty ratified by the United States is not only the law of this land . . . but
also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation
the negotiating and drafting history (travaux préparatoires) and the postratification understanding of the
contracting parties.")

preferences developed while awaiting the disposition of wrongful removal and retention lawsuits would render the Convention essentially meaningless. Even worse, it would reward the malfeasant parents, allowing them the opportunity to seek to obviate their wrongful removal or retention during the pendency of legal disputes. In light of the foregoing, the Court will not invoke the discretionary exception to return contained in Article 13.

Even if this case presented a potentially appropriate instance in which to apply the wishes of the child exception, Tsui bears the burden of proving its applicability. At the direction of the President, the State Department submitted a legal analysis of the Convention, codified at 51 FR 10494-01, which discussed the wishes of the child exception. "This discretionary aspect of Article 13 is especially important because of the potential for brainwashing of the child by the alleged abductor. A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child." 51 FR 10494-01, Section III.I(2). Thus, the Court must be satisfied not only that Raeann has reached an age and degree of maturity at which it is appropriate to take into account her views, but also that her objections are grounded in her own mature opinion and are not merely the conduit for the opinions of others. Based on the evidence of record, Tsui has failed to prove either fact by a preponderance of the evidence.

In light of her relative youth and to protect her from any additional suffering beyond that which has already been visited upon her, the Court heard Raeann's testimony *in camera*, with counsel present. It is clear from her testimony that Raeann is a bright, intelligent, and pleasant child. This conclusion is bolstered by the expert testimony offered by Dr. Paul Bernstein, a psychologist and expert witness retained by Tsui, who examined Raeann to determine her level of

maturity. Dr. Bernstein testified that Raeann is extremely intelligent, with an impressive memory and formidable analytical skills. Raeann told Dr. Bernstein that she wished to stay in Pittsburgh, and told him it is because "she loves her school. She is happy there. Prefers living in a house than living in a small apartment. Never bored because she has two brothers, and that she's doing well in school and would just like to remain where she is." Tr. at 100.

This testimony is consistent with Dr. Bernstein's report, prepared at the time of his examination, wherein he quotes Raeann as saying that "I have lived here for more than three years and I have many friends here." She added, "the best school is in Pittsburgh, and I like being in a house rather than an apartment." Raeann assured Dr. Bernstein that "I miss my mom. I like to talk to her two to three times a week. I know she is very sick." Ex. M. Raeann testified similarly at the hearing, where she indicated a desire to stay in Pittsburgh because "we have our own pet and our own house, and I have lots of friends, and my grades got better, and my skin got better." Tr. at 131. Raeann also testified that she did not know when her mother got better.

Although he admitted that Raeann's experiences here in the United States with her father have had a "major impact" on her desire to stay, when asked about the possibility of coercion Dr. Bernstein testified that "this was a really independent, lively, smart little girl that showed no signs of coercion or pressure of her father or stepmother." Tr. at 101, 111. The facts of the case, however, indicate otherwise. It is clear from her presence at the hearing, along with the results of her current treatment, that Yang has sufficiently recovered from her surgery and the complications that followed. Yet Raeann was not aware that her mother had recovered, and in fact told Dr. Bernstein that her mother "is very sick." When questioned by the Court, Dr. Bernstein admitted

28

that when Raeann stated that her mother "is very sick," she was necessarily expressing someone else's opinion, rather than her own. Tr. at 123.

Raeann also told Dr. Bernstein that "the best school is in Pittsburgh." Yet Dr. Bernstein acknowledged that Raeann is not able to compare the quality of American and Canadian schools. When asked by the Court if Raeann necessarily was expressing someone else's opinion about the "best school" being in Pittsburgh, Dr. Bernstein surmised that Raeann did not mean to use "best" in a comparative sense. He told the Court that "if you or I would use the word 'best,' it would be comparative. When a 9-year-old exclaims it's the best school, compared to what[?]" Tr. at 122. Dr. Bernstein then explained that "I think it was analogous to it's a great school. It's a wonderful school. I'm happy there. I don't think she was making a comparative statement." *Id.* This explanation is, at least on one level, at odds with Dr. Bernstein's report, which concluded that Raeann has a borderline genius IQ. The report explains that "the single best index of overall intelligence is Vocabulary." In fact, Dr. Bernstein concluded that "Raeann's scaled score of fifteen on this [vocabulary] test, fell within the Superior range, an indication of the wealth of her intellectual and cultural circumstances. This nine-year-old correctly defined: Amendment, Boast, Transparent, and Mimic." Ex. M.

This detailed analysis belies the notion that Raeann did not understand the fundamental meaning of the word "best" when she spoke of her school in Pittsburgh. When looking to support his maturity determination, Dr. Bernstein characterized Raeann as a borderline genius with an impressive vocabulary. On the other hand, when evidence suggested undue influence or coercion by Tsui, Dr. Bernstein described Raeann as a nine year-old who does not understand the meaning of the word "best." Accordingly, the Court finds that when Raeann testified the "best school is in

29

Pittsburgh," she was merely repeating what Tsui had told her, just as when she said that she knows her mother "is very sick." The fact that one of the reasons Raeann wants to stay in Pittsburgh and her perception of her mother's situation were both, in fact, the product of outside influence, especially when combined with her tender age, requires that little if any weight should be given to Raeann's expressed preference to remain in Pittsburgh.

Furthermore, the additional reasons Raeann offered - her friends in Pittsburgh, the comfortable living conditions, and the amount of time she has lived in Pittsburgh - have been held in other cases to be insufficient to satisfy the requirements of the Article 13 exception. The Court of Appeals for the Fifth Circuit, in discussing the maturity of a thirteen year-old child, held "that Karina has maintained her friendships with children in America, prefers America to Australia, and now enjoys a situation that has stabilized does not establish that she is mature enough for a court appropriately to consider her views on where she would prefer to live under the Hague Convention. Rather, these findings only establish that Karina prefers to remain in the United States and that some reasons support this preference." *England*, 234 F.3d at 272 (internal citation omitted).

Although Raeann may be more stable and well-adjusted than the child wrongfully removed in *England*, the approach to analyzing her proffered reasons remains the same. It appears clear that, as a friendly, talented, and well-adjusted child, Raeann has acclimated to her new surroundings, as anyone of her temperament would adjust to comfortable circumstances. This adjustment, however, does not provide the basis for a particularized objection to returning to Canada above and beyond what any 10 year-old would feel when faced with the prospect of leaving family and friends. The Court cannot conclude, based on how narrowly it should interpret

Article 13, that the exception is meant to give dispositive effect to the general hesitance of children to leave comfortable surroundings. In light of the evidence that others have influenced Raeann's opinion and the general nature of her objection, taking her views into account would not be appropriate in this case.

Thus, because the requirement for the wishes of the child exception have not been met, and because its application would be an inappropriate exercise of discretion in contravention of the purposes of he Hague Convention, the Court declines to invoke the exception.

## VI.    Conclusion

Regardless of his motivation, it is clear from the evidence that sometime after Raeann came to the United States, Tsui decided that he would unilaterally exercise his paternal authority to keep her here. He began to limit Raeann's contact with her mother and procured an American custody order while Raeann's mother was hospitalized. This is precisely the type of improper retention and international custody forum shopping that the Convention is meant to prevent. Absent one of the exceptions contained in Article 13, Article 12 mandates that the Court "shall order the return of the child forthwith." Accordingly, the Court will grant Yang's Petition in an appropriate Order filed herewith.

Thomas M. Hardiman
United States District Judge

Dated: August 25, 2006

31

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TSAI-YI YANG, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 2:03-cv-1613 |
| | ) Judge Thomas M. Hardiman |
| FU-CHIANG TSUI, | ) |
| | ) |
| Respondent. | ) |

## ORDER

AND NOW, this August 25, 2006, Petitioner having filed a Petition for Return of Child

(Doc. No. 1), Respondent having filed a Response (Doc. No. 6), a hearing having been held on

June 28, 2006, the parties having submitted Proposed Findings of Fact and Conclusions of Law on

August 3, 2006, it is hereby

ORDERED that the Petition for Return of Child is GRANTED; it is further

ORDERED that Respondent Fu-Chiang Tsui shall return Raeann Tsui forthwith to the

custody of her mother, Petitioner Tsai-Yi Yang, as more specifically directed during a telephonic

status conference on Monday, August 28, 2006 at 3:00 p.m.

BY THE COURT:

*Thos M. Hardiman*

Thomas M. Hardiman
United States District Judge